## Wakefield's Adoption

*Rowley & Smith,* for petitioner.
*Baldwin & Baldwin,* for respondent.

READER, P. J., May 2, 1944.—In the above-stated proceeding a decree was entered on April 26, 1940, for the adoption of James John Wakefield by John D. Merten and Henrietta M. Merten, his wife. On November 17, 1943, Gale Shields Patterson presented her petition setting forth that she is the natural mother of James John Wakefield, alias Thomas James Wakefield, and praying that the decree of adoption hereinbefore referred to be annulled and set aside. In her petition she avers that she never consented to the adoption of her said son by John D. Merten and Henrietta M. Merten, and that she has never, at any time, abandoned her said son James John Wakefield. The petition further avers that the proceeding was without the knowledge of the said Gale Shields Patterson. On December 29,

1943, the date on which hearing was had upon her petition, petitioner filed an amendment to her petition, adding thereto a paragraph, no. 8, which reads as follows:

"8. No notice, either actual or constructive, was given to your petitioner of the above-entitled adoption proceedings."

An answer having been filed to the petition of Gale Shields Patterson, the matter was heard before the court on December 29, 1943. At this time considerable testimony was taken on the part of petitioner and respondents.

From the evidence it appears that Gale Shields, now Mrs. Samuel Patterson, petitioner, was born April 4, 1915. On June 16, 1930, she was married to James Wakefield, who was her first cousin. On December 25, 1930, she gave birth to Thomas James Wakefield, named in the adoption proceeding as James John Wakefield. She lived with James Wakefield for just a few weeks after their marriage. Her father then took her to his home and refused to allow her to see James Wakefield again. Upon inquiry her father was advised that owing to the relationship of his daughter and James Wakefield their marriage was a nullity. Petitioner's parents required the father of the child, James Wakefield, either to contribute to the support of the child or to take him into his own custody. The father chose the latter course and the child was committed to his custody. In 1932 petitioner married Samuel Patterson. Several times thereafter she visited her boy, who was then living with his father at Turtle Creek. Later James Wakefield moved away, taking the child with him. Petitioner stated that for a considerable time thereafter she knew nothing of the whereabouts of the boy. She testified that in August 1943 James Wakefield appeared in the vicinity of Pitcairn and Trafford and she learned that the child was not with him. Upon inquiry she learned of the adoption pro-

ceeding and sought to recover possession of her son. Upon the refusal of the adopting parents to surrender possession of him she filed her petition for the purpose of having the decree of adoption vacated..

There is no question that the mother of the boy, James John Wakefield, had no notice of the adoption proceedings, was not a party thereto, and was not heard when the matter was before the court. In this state of the facts we think the controlling question is as to the jurisdiction of the court to make an order in the adoption proceeding which would be binding upon her. It is a general rule of the law that decrees or judgments of the courts are binding only where the court has jurisdiction both of the subject matter and of the parties affected. The rule which seems to us to be applicable to the case is thus stated by the Supreme Court of the United States in the case of Pennoyer v. Neff, 95 U. S. 714, 729:

"The force and effect of judgments rendered against non-residents without personal service of process upon them, or their voluntary appearance, have been the subject of frequent consideration in the courts of the United States and of the several States, as attempts have been made to enforce such judgments in States other than those in which they were rendered, under the provision of the Constitution requiring that 'full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State;' and the act of Congress providing for the mode of authenticating such acts, records, and proceedings, and declaring that, when thus authenticated, 'they shall have such faith and credit given to them in every other court within the United States as they have by law or usage in the courts of the State from which they are or shall be taken.' In the earlier cases, it was supposed that the act gave to all judgments the same effect in other States which they had by law in the State where rendered. But this view was afterwards qualified

so as to make the act applicable only when the court rendering the judgment had jurisdiction of the parties and of the subject-matter, and not to preclude an inquiry into the jurisdiction of the court in which the judgment was rendered, or the right of the State itself to exercise authority over the person or the subject-matter."

While in the case just referred to the rule was applied to the situation where the judgment of one State was sought to be given effect in another State, no personal service having been had upon defendant in the original State where the judgment was entered, there is no question that the principle is applicable to all cases in which there is failure to obtain jurisdiction of the person against whom or against whose interest the judgment or decree is entered. While in a number of States a contrary rule obtains, that stated by the Supreme Court of the United States in the above-cited case, and in many others, is followed in Pennsylvania, and is the established rule of our law. Among the decisions of our Supreme Court in which this rule is recognized are the following: Colvin v. Reed, 55 Pa. 375; Reel v. Elder, 62 Pa. 308; Price et al. v. Schaeffer et al., 161 Pa. 530. Our attention has not been called to any Pennsylvania case in which the rule above stated is applied to the decree of the court in an adoption proceeding.

In 1 C. J. 1394, n. (a), the rule is stated as follows:

"A parent who had no notice of the adoption proceedings can attack the decree collaterally on habeas corpus for the possession of the child."

This rule is supported by the decison of the Supreme Court of Wisconsin in the case of Schiltz v. Roenitz, 86 Wis. 31, 56 N. W. 194, 21 L. R. A. 483. In this case the court said, among other things:

"The proceedings and order of adoption relied on by the defendant do not recite or show any consent of either the parents of the child, Mary Schiltz, or by any

of her next of kin or her guardian, to such adoption, but of Jacob Imig, 'duly appointed by the court for that purpose;' but the proceedings recite that the plaintiff *had abandoned her*, and that her mother was dead. There is nothing whatever to show that any notice was ever given to the plaintiff to appear and defend against the application or assert his natural rights, or that he appeared at the hearing, but the inference from the record is quite to the contrary. Although it is too well settled to admit of dispute that the father can recover for the loss of the services of his minor child, against any one causing such loss, (Rooney v. Milwaukee Chair Co., 65 Wis. 397), the proceeding in question was held by the court conclusive evidence, by judicial decision, that he had abandoned his daughter Mary, and that by virtue of the alleged order of adoption he had been lawfully deprived of the right to her services, of all legal rights whatsoever respecting her, and that she was free from all natural filial relations to her father, although he had had no notice of the charge, or time and place of hearing and no opportunity whatever to defend against it, and although he had been condemned without a hearing, and denied the charge of abandonment in his complaint in this action. The circuit court held the charge of abandonment conclusively established by the order of adoption, and dismissed his complaint.

"The contention that the county court could, without notice to the plaintiff or opportunity to him to defend against the charge of abandonment, grant an order depriving the plaintiff of his most sacred natural rights in respect to his child, so jealously guarded and protected by the laws, offends against all our ideas respecting the administration of justice, and is opposed to the principles which lie at the foundation of all judicial systems not essentially despotic in their character and methods of procedure. It is provided by the fourteenth amendment to the constitution of the

United States that 'no state shall . . . deprive any person of life, liberty or property without due process of law.' Due process of law, as applied to judicial proceedings, includes a charge before some judicial tribunal, and notice to the party in some form, either actual or constructive, and an opportunity to appear and produce evidence in his defense and be heard by himself or counsel. To proceed to adjudicate in the absence of notice to the party 'would be contrary to the first principles of the social compact, and of the right of administration of justice.' McVeigh v. United States, 11 Wall. 267. In Windsor v. McVeigh, 93 U. S. 277, it is held that: 'Whenever one is assailed in his person or his property, there he may defend, for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of the court pronounced against a party without hearing him or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal. That there must be notice to the party of some kind, actual or constructive, to a valid judgment affecting his rights, is admitted. Until notice is given the court has no jurisdiction, in any case, to proceed to judgment, whatever its authority may be, by the law of its organization, over the subject-matter.' These are familiar principles, existing before and secured by the fourteenth amendment, and they are sustained by a vast number of adjudicated cases and a wealth of argument and illustration with which it is not necessary to extend a judicial opinion. The cases all hold a consistent rule on this fundamental point. The paramount law of the land condemns the proceeding here in question, and it is impossible to justify or sustain it. We have not been referred to a single adjudicated case which holds that such an order as this is valid, as against the claim of the natural father to the services of his minor child,

or as affording any evidence that he had abandoned it. Certainly, nothing is gained by saying that the proceeding is one *quasi in rem*, for, in all such, notice to the party to be affected and bound, either actual or constructive, is absolutely essential. Nor is it material that the order may be set aside on petition, appeal, or *certiorari*. The fact still remains that as to the father the order is a mere nullity and may be disregarded as such whenever and wherever it comes in question as against him or as affecting his rights. . . . The judgments and decisions of a judicial tribunal are conclusive and secure against collateral attack only when the tribunal rendering them had jurisdiction of the subject matter and of the parties to be affected by them. By reason of the want of jurisdiction of the person of the plaintiff, the proceeding in question established nothing as against him, and is no evidence that he abandoned his child. That question remains, therefore, for trial upon the issue tendered by the complaint."

To the same effect are the decisions in the following cases: In re Moore, 72 N. Y. Misc. 644, 132 N. Y. Supp. 249; People ex rel. Cornelius v. Callan et ux., 69 N. Y. Misc. 187, 124 N. Y. Supp. 1074; Ex parte Livingston, 151 A. D. 1, 135 N. Y. Supp. 328; Sullivan v. People ex rel. Heney, 224 Ill. 468, 79 N. E. 695. A similar decision is the California case of Estate of Hampton, 55 Cal. App. (2d) 543, 131 P. (2d) 565; an abstract of this decision being found at page 74 of the issue of Current Legal Thought for October 1943.

It is true that under our original decree we found that the mother had abandoned her child. A decree of adoption may be based upon such abandonment without the consent of the parent under our Pennsylvania statute. The finding of abandonment, however, is as ineffective as to a parent without notice as is any other part of the decree. We are of the opinion, therefore, that the decree of April 26, 1940, hereinabove referred to, is a nullity as to Gale Shields Patterson, the mother

of James John Wakefield, and as to her should be set aside.

It was suggested at the hearing that upon the vacation of the decree of adoption the court might proceed to hear evidence as to the fact whether Gale Shields Patterson had actually abandoned her son prior to the decree of adoption. Counsel for the adopting parents have called our attention to Hazuka's Case, 345 Pa. 432. In this case the Supreme Court determined what constituted an abandonment under the evidence presented in that case. It is argued that under this ruling the court might well find under the evidence presented in the instant case that Gale Shields Patterson had, in fact, abandoned her son. We are satisfied, however, that we cannot properly go into that question in the present proceeding. The petition to vacate the decree of adoption is based upon the failure to make the mother a party to the proceeding. We think it does not constitute a general appearance in the proceeding. The governing rule is thus stated in 1 Standard Pa. Practice 408, sec. 147:

"In the case of a judgment void for want of service of process, the defendant does not waive the question of jurisdiction or validate the void judgment by an appearance in support of a motion to set the judgment aside."

At the hearing the question was also raised as to the effect of the vacation of the decree of adoption upon the custody of James John Wakefield. That question is not properly before us in this proceeding. It may be raised in another appropriate proceeding. James John Wakefield is at an age when his preferences may have a great deal to do with the question of his custody.

### Order

Now, to wit, May 2, 1944, it is hereby ordered, adjudged, and decreed that the decree of adoption entered on April 26, 1940, in the above-entitled case, be and

the same hereby is vacated and set aside so far as Gale Shields Patterson, the mother of James John Wakefield, is concerned; the costs of this proceeding to be paid by John D. Merten and Henrietta M. Merten.